IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Receivership of:<br><br>CASTLE WALLS, LLC.<br><br>JOHANSEN CONSTRUCTION COMPANY, LLC,<br><br>          Appellant,<br><br>          v.<br><br>REVITALIZATION PARTNERS, LLC,<br><br>          Respondent. | No. 85105-5-I<br><br>DIVISION ONE<br><br>ORDER WITHDRAWING AND SUBSTITUTING OPINION |

The court has determined that the opinion filed on March 25, 2024 shall be withdrawn and a substitute opinion filed.

Now, therefore, it is hereby

ORDERED that the opinion filed on March 25, 2024 shall be withdrawn and a substitute opinion filed.

_____
Hazelrigg, A.C.J.

_____
Chung, J.

_____
Smith, C.J.

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

In the Matter of the Receivership of:

CASTLE WALLS, LLC.

JOHANSEN CONSTRUCTION COMPANY, LLC,

                Appellant,

        v.

REVITALIZATION PARTNERS, LLC,

                Respondent.

No. 85105-5-I

DIVISION ONE

PUBLISHED OPINION

HAZELRIGG, A.C.J. — Johansen Construction Company LLC appeals the trial court's revised order for turnover which required Johansen to pay $228,863.88 to the court-appointed receiver, Revitalization Partners LLC, pursuant to the receivership statute, ch. 7.60 RCW. Because Johansen fails to show the trial court abused its discretion in revising the commissioner's order for turnover of those funds, we affirm.

FACTS

On November 19, 2020, general contractor Johansen Construction Company entered into a subcontract agreement with Castle Walls LLC. Pursuant to the subcontract, Castle Walls agreed to construct a retaining wall for the "Proctor Willows" project (the project), which was owned by the Quadrant Corporation.

Under the terms of the subcontract with Johansen, Castle Walls was responsible for providing all supervision, materials, labor, supplies, and equipment. Castle Walls subcontracted with a supplier, Automatic Wilbert Vault Co. (AWVC), for block wall materials that it was to install on the project. Between September and December 2021, Castle Walls sent four invoices to Johansen; in total, Castle Walls requested $228,863.84. Johansen paid those invoices in full with three checks: (1) $82,108.21 issued on November 18, 2021; (2) $79,826.22 issued on February 4, 2022; and (3) $66,929.40 issued on March 18, 2022. Each check from Johansen contained the following language: "PAY TO THE ORDER OF Castle Walls, LLC. and Automatic Wilbert Vault Co., Inc." Castle Walls signed each of the checks and deposited the funds into its bank account without obtaining a signature from AWVC.[1]

On May 16, 2022, after receiving a claim of lien from AWVC based on nonpayment for block wall materials used in the project, Johansen sent a letter to Castle Walls in which it wrote that Castle Walls was past due on payments owed to AWVC in the amount of $127,547.75. The letter also stated:

> Joint [c]hecks issued to [Castle Walls] **and** AWVC by [Johansen] appear to have been deposited by [Castle Walls'] bank without proper endorsement by AWVC. While this issue may present specific issue for [Castle Walls'] [b]ank and result in potential violation of certain [b]anking [l]aws, it does not change [Castle Walls'] liability or duty to defend and indemnify the project [o]wner and/or [Johansen] from the AWVC [l]ien [c]laim.

On June 8, Johansen sent another letter in which it demanded that Castle Walls "remedy its default and pay AWVC in full for materials supplied to the [p]roject

---

[1] The checks were deposited on December 1, 2021, February 11 and March 25, 2022, respectively.

- 2 -

within three business days." Johansen explained that, if Castle Walls failed to pay, the subcontract may be terminated and Castle Walls would be held responsible for "all expenses, costs and fees incurred to remedy the default and complete performance of the [s]ubcontract work." Two weeks later, June 22, Johansen informed Castle Walls via e-mail and certified mail that it was terminating the subcontract for cause as Castle Walls had failed to pay AWVC in accordance with the subcontract and had not responded to Johansen's "repeated requests, [or] return[ed] any phone calls or e[-]mails."

On July 28, Castle Walls filed a petition in King County Superior Court for appointment of a general receiver pursuant to RCW 7.08.030 and requested that Revitalization Partners be assigned as general receiver over all Castle Walls' assets. The following day, July 29, a commissioner of the court entered an order appointing Revitalization as the general receiver for Castle Walls. Under its plain language, "[i]mmediately upon entry" of the appointment order, any "person or entity in a position to exercise control over the [a]ssets [wa]s [t]hereby prohibited from obstructing, delaying, or interfering with the [r]eceiver in the performance of its duties or from taking any action purporting to transfer, encumber, or dispose of the [a]ssets or any portion of the [a]ssets."

On August 3, Castle Walls' bank reversed the three checks deposited into its business account based on an apparent determination that each one contained an "Invalid Endrosement [sic]," returning the total amount of $228,863.83 to Johansen.[2]  On August 31, after the deposits were reversed, Revitalization sent

---

[2] In support of its motion for turnover of the disputed funds, Revitalization included as an exhibit a copy of an August 2022 bank statement for a Castle Walls account that contains three

an e-mail to Johansen that requested the contractor return the $228,863.83 by September 9, and explained the "funds will be deposited in the receiver's account for distribution to creditors in accordance with orders of the court and the receivership statute." Johansen refused to return the funds and stated that Castle Walls had cashed those checks without obtaining any endorsement by AWVC and without paying AWVC, which "resulted in Castle Walls being terminated for cause as of July 22, 2022."

On November 16, Revitalization filed a motion for turnover of the disputed funds pursuant to RCW 7.60.005(9) and .060, and for attorney fees. On December 8, Johansen filed its response opposing the turnover motion and argued that the requested funds "are not due to Castle Walls, are not an asset or property of the [r]eceivership estate, and the [r]eceiver has no claim over the funds." At the conclusion of the hearing on December 14, the commissioner granted Revitalization's motion for turnover, in part, and issued a written order that required Johansen to pay $101,289.08 into the court registry within 10 days. The commissioner did not award attorney fees.

On December 27, both parties filed motions for revision of the commissioner's turnover order. Following a hearing on February 3, 2023, the trial

---

separate withdrawals on August 3, 2022. The first is in the amount of $82,108.21 with a transaction description that reads, "Descriptive Withdrawal 12/1/22 DEP ADJ - CK # 25850 - Invalid Endrosement [sic]." This amount corresponds with the progress invoice Castle Walls submitted to Johansen in September 2021. The second withdrawal is listed as $79,826.22 and the transaction description says, "Descriptive Withdrawal 2/11/22 DEP ADJ - CK # 26525 - Invalid Endrosement [sic]." The amount of this withdrawal matches the total of the progress invoices Castle Walls submitted to Johansen in October and November 2021. The third withdrawal amount is for $66,929.40 with the transaction description listed as, "Descriptive Withdrawal 3/25/22 DEP ADJ - CK # 26865 - Invalid Endrosement [sic]." The amount of this third withdrawal is the same as that listed on the progress invoice from Castle Walls to Johansen in December 2021.

court granted Revitalization's motion for revision in full and ordered Johansen to pay Revitalization $228,863.83. Pursuant to the revised order entered on February 6, if Johansen did not pay Revitalization within 30 days, Revitalization was entitled to present a judgment against Johansen in that amount plus interest. The trial court also awarded attorney fees and costs to Revitalization in accordance with LCR 7(b). On March 10, over 30 days after the trial court's order on revision was entered, Johansen had still not paid the $228,863.83 and Revitalization moved for entry of judgment in that amount, plus interest. Johansen objected to Revitalization's proposed judgment and requested a continuance of the date for presentation of judgment. Ultimately, on April 13, 2023, the trial court entered judgment in favor of Revitalization and against Johansen for $228,863.83. Further, pursuant to the revised turnover order, the trial court noted that Revitalization may apply for an award of attorney fees and costs.

Johansen timely appealed.

ANALYSIS

I. Statutory Framework for Receivership and Standard of Review

As "[c]hapter 7.60 RCW gives the trial court broad discretion over receiverships" and, "because a receivership is an equitable remedy," this court reviews the trial court's decisions to both order turnover and enter judgment pursuant to a receivership under an abuse of discretion standard.[3] *Bero v. Name*

---

[3] Johansen contends the standard of review is de novo because the trial court did not make any findings of fact. For this proposition, it cites to RCW 2.24.050 and *State v. Ramer*, 151 Wn.2d 106, 113, 86 P.3d 132 (2004). Neither authority supports Johansen's contention and this court has already held the standard of review here is abuse of discretion.

*Intel., Inc.,* 195 Wn. App. 170, 175, 179, 381 P.3d 71 (2016); *In re Receivership of Applied Restoration, Inc.*, No. 84320-6-I, slip op. at 8 (Wash. Ct. App. Dec. 4, 2023), https://www.courts.wa.gov/opinions/pdf/843206.pdf. "A trial court abuses its discretion when its order is manifestly unreasonable or based on untenable grounds" and the "trial court necessarily abuses its discretion if it applies the incorrect legal standard." *Gillett v. Conner*, 132 Wn. App. 818, 822, 133 P.3d 960 (2006). Findings of fact and conclusions of law are not required in matters of equity and need not be included in the trial court's receivership order. *MONY Life Ins. Co. v. Cissne Fam. LLC,* 135 Wn. App. 948, 952, 148 P.3d 1065 (2006) (citing *Clebanck v. Neely*, 163 Wash. 333, 335, 1 P.2d 239 (1931)).

As this court recently explained, "Receiverships are an equitable remedy, and trial courts are 'accorded great flexibility in fashioning relief under their equitable powers.'" *Applied Restoration,* slip op. at 8 (quoting *Friend v. Friend*, 92 Wn. App. 799, 803, 964 P.2d 1219 (1998)). "These are not narrow powers." *King County Dep't of Cmty. & Hum. Servs. v. Nw. Defs. Ass'n*, 118 Wn. App. 117, 127, 75 P.3d 583 (2003). While equitable powers are to be exercised with restraint, courts "have wide latitude to respond to the particular circumstances presented." *Id.*

A receiver is a "person *appointed by the court as the court's agent*, and subject to the court's direction, to take possession of, manage, or dispose of property of a person." RCW 7.60.005(10) (emphasis added). General receivers are "appointed to take possession and control of all or substantially all of a person's property with authority to liquidate that property and, in the case of a business over

which the receiver is appointed, wind up affairs." RCW 7.60.015. Thus, a general receiver "has broad powers to manage the receivership property, liquidate assets, and satisfy creditors." *Bero,* 195 Wn. App. at 175.

Pursuant to RCW 2.24.050, all commissioner rulings are subject to revision by the superior court. On a motion for revision, "the superior court reviews the commissioner's decisions de novo based on the evidence and issues before the commissioner." *In re Est. of Bernard*, 182 Wn. App. 692, 727-28, 332 P.3d 480 (2014). "Once the superior court makes a decision on revision, the appeal is from that decision." *Faciszewski v. Brown*, 187 Wn.2d 308, 313 n.2, 386 P.3d 711 (2016). Thus, we review the superior court's decision, not the commissioner's ruling. *Bernard*, 182 Wn. App. at 728.

II.     Bona Fide Disputes and Procedural Requirements

Johansen first assigns error to the trial court's revised order for turnover of the $228,863.83 because "there was a bona fide dispute over whether [those funds] were assets of the [r]eceivership [e]state."[4] According to Johansen, due to this "bona fide dispute," Revitalization was required to bring an adjunct proceeding under RCW 7.60.160 instead of moving for turnover pursuant to RCW 7.60.070. We disagree.

Under RCW 7.60.070, when a receiver demands turnover of estate property, "any person shall turn over any property over which the receiver has been

---

[4] On that same basis, Johansen assigns error to the trial court's order requiring Johansen to pay the funds to Revitalization rather than placing them into the court registry.

appointed that is within the possession or control of that person unless otherwise ordered by the court for good cause shown." This provision goes on to explain:

> A receiver by motion may seek to compel turnover of estate property *unless there exists a bona fide dispute with respect to the existence or nature of the receiver's interest in the property, in which case turnover shall be sought by means of an action under RCW 7.60.160.* In the absence of a bona fide dispute with respect to the receiver's right to possession of estate property, the failure to relinquish possession and control to the receiver shall be punishable as a contempt of the court.

RCW 7.60.070 (emphasis added). Thus, the existence of a "bona fide dispute" is central to whether the receiver may seek to compel turnover under RCW 7.60.070 or whether the ownership of the property is to be determined in an adjunct proceeding under RCW 7.60.160.

Although Johansen dedicates a significant portion of briefing to its contention that Revitalization was required to bring an adjunct proceeding because of the assertion that there was a bona fide dispute over ownership of the funds, Johansen did not raise this argument before the commissioner or the trial court. Even assuming arguendo that there was a bona fide dispute as to these funds, nothing in the statute mandates that it is the sole responsibility of the receiver to either present such an issue or to initiate an adjunct proceeding on that basis. The language of RCW 7.60.160(1) is plain on its face: "The receiver has the right to sue and be sued in the receiver's capacity as such." Adjunct proceedings may be initiated "by *or against* the receiver." RCW 7.60.160(2) (emphasis added). As the statute provides, any "action seeking to dispossess the receiver of any estate property or otherwise to interfere with the receiver's management or control of any

estate property may not be maintained or continued unless permitted by order of the court obtained upon notice and a hearing." RCW 7.60.160(1).

The plain language of the statute certainly envisions factual scenarios wherein a receiver may be presented with a challenge to a claim regarding an asset, by a creditor or a third party, which it may perceive as a bona fide dispute, triggering a requirement to initiate an adjunct proceeding under RCW 7.60.160 in order to litigate ownership. However, the mere fact that an adjunct proceeding is available demonstrates that the legislature did not intend for a receiver to be the final arbiter of whether a dispute is bona fide. Where, as here, the receiver clearly disagrees with a challenger to a claim over an asset, the plain language of the statute allows for the initiation of an adjunct proceeding "against a receiver" in order to establish that its dispute over the asset is bona fide. Briefing in the trial court and on appeal establishes that Revitalization did not consider the dispute over the funds to be bona fide as they had been credited to a bank account that was property of the receivership estate, and therefore subject to the stay, at the time of their removal.

Here, Johansen made a strategic decision against initiating an adjunct proceeding to litigate its claim of ownership over the funds. While it had the right to dispute the $228,863.83 outside of the receivership case, Johansen chose to participate in the summary proceedings under RCW 7.60.070. Not once did it insist that an adjunct proceeding was required in order to determine ownership of the funds, effectively seeking a ruling on the question of whether the dispute it presented was in fact bona fide, nor did it move to initiate one. Instead, Johansen

waited until this appeal to argue that there was a bona fide dispute that necessitated a separate proceeding below. This court "will consider an issue raised for the first time on appeal if the claimed error is a manifest error affecting a constitutional right." *Hiesterman v. Dep't of Health*, 24 Wn. App. 2d 907, 913, 524 P.3d 693 (2022) (citing RAP 2.5(a)(3)). To satisfy RAP 2.5(a) and obtain review of an issue for the first time on appeal, "an appellant must show (1) the error is manifest, and (2) the error is truly of constitutional dimension." *City of Seattle v. Long,* 198 Wn.2d 136, 155-56, 493 P.3d 94 (2021). Because Johansen does not even address RAP 2.5 in its opening brief, let alone attempt to establish that it could satisfy the two-part test required to raise an alleged error for the first time on appeal, we need not determine whether there was in fact a "bona fide dispute."[5]

III.    Automatic Stay and Property of the Estate

Johansen next contends that the funds subject to the turnover order were not property of the estate pursuant to RCW 7.60.005(9) because they were not the property of Castle Walls. According to Johansen, the portion of the checks directed to AWVC was never property of Castle Walls and the portion directed to Castle Walls was no longer owed because Castle Walls breached the subcontract. Relying on the premise that "the [r]eceiver stands in the shoes of the debtor and

---

[5] In its reply brief, Johansen attempts to satisfy the standard under RAP 2.5 with its argument that the turnover order constituted an "unconstitutional taking." However, this court "will not consider issues argued for the first time in the reply brief." *Ainsworth v. Progressive Cas. Ins. Co.,* 180 Wn. App. 52, 78 n.20, 322 P.3d 6 (2014). Additionally, because Johansen's "unconstitutional taking" argument was raised for the first time on appeal and Johansen fails to address RAP 2.5 until its reply brief, we do not reach the merits of that claim either. *See Hiesterman,* 24 Wn. App. 2d at 913; *Ainsworth*, 180 Wn. App at 78 n.20.

has no more rights to the property than did the debtor," Johansen concludes that Revitalization had no right to the funds here.

While our Supreme Court has previously noted that "the receiver stands in the shoes of the insolvent," this does not end the inquiry. *Morse Electro Prods. Corp. v. Beneficial Indus. Loan Co.,* 90 Wn.2d 195, 198, 579 P.2d 1341 (1978). Not only has the legislature amended the receivership statute in the decades since *Morse* was published, but the blind application of such a rule would require this court to ignore the specific circumstances of the case, the equitable powers of the court, and the relevant provisions of the current receivership statute.

Pursuant to RCW 7.60.110(1)(c), the trial court's appointment of a general receiver operates as an automatic stay, applicable to all persons, of "[a]ny act to obtain possession of estate property from the receiver, or to interfere with, or exercise control over, estate property." The estate is "the entirety of the property with respect to which a receiver's appointment applies." RCW 7.60.005(3). The property of the estate encompasses "all right, title, and interests, both legal and equitable, and including any community property interest, in or with respect to any property of a person with respect to which a receiver is appointed, regardless of the manner by which the property has been or is acquired." RCW 7.60.005(9). It also "includes any proceeds, products, offspring, rents, or profits of or from property in the estate." *Id.*

As Washington case law on receiverships is limited and no case directly addresses "estate property" under RCW 7.60.005(9), we look to federal bankruptcy law for guidance. *St. John Med. Ctr. v. Dep't of Soc. & Health Servs.,* 110 Wn.

- 11 -

App. 51, 60, 38 P.3d 383 (2002). Similar to the appointment of a receiver and the resulting estate, "filing for bankruptcy creates an estate which includes 'all legal or equitable interests of the debtor in property as of the commencement of the case.'" *In re Castleman*, 75 F.4th 1052, 1056 (9th Cir. 2023) (quoting 11 U.S.C. § 541(a)(1)). As with RCW 7.60.005(9), the property of the estate in bankruptcy "also includes all 'proceeds, product, offspring, rents, or profits of or from property of the estate." *Id.* (quoting 11 U.S.C. § 541(a)(6)). Numerous bankruptcy cases on which Revitalization relies hold that property of the estate includes the debtors' interest in their bank accounts. *See In re Turner Grain Merch., Inc.,* 557 B.R. 147, 150 (Bankr. E.D. Ark. 2016) (quoting 11 U.S.C. § 541(a)(1)) ("[A] debtor's interest in a bank account on the petition date constitutes property of the debtor's estate because property of the estate includes 'all legal or equitable interests of the debtor in property as of the commencement of the case.'"); *see also In re Ruiz,* 455 B.R. 745, 749 n.13 (10th Cir. B.A.P. 2011) ("*See, e.g., In re Pyatt,* 486 F.3d 423, 427 (8th Cir. 2007) ('the funds transferred by the pre-petition checks are property of the estate'); *In re Brubaker,* 426 B.R. 902, 905 (Bankr. M.D. Fla. 2010), *aff'd,* 443 B.R. 176 (M.D. Fla. 2011) ('both schools of thought agree that the funds are property of the estate'); *Yoon v. Minter-Higgins,* 399 B.R. 34, 42-44 (N.D. Ind. 2008) (holding money in the debtors' bank account on the petition date became property of the estate); *In re Parsons,* No. 05-00321, 2006 WL 3354513, at *1 (Bankr. S.D. Ind. Nov. 17, 2006) ('Funds on deposit in a debtor's checking account . . . on the petition date are property of the bankruptcy estate.'); *In re Schoonover,* No. 05-43662-7, 2006 WL 3093649, at *2 (Bankr. D. Kan. Oct. 30, 2006) ('This [c]ourt has located

- 12 -

eight decisions that address this issue. As a threshold matter, all eight decisions agree that the money in the checking account is property of the estate.'); *In re Spencer,* 362 B.R. 489, 491 (Bankr. D. Kan. 2006) ('[T]he funds remained in the debtors' possession and control at the date of the petition, were property of the estate, and were therefore subject to turnover.'); *In re Sawyer,* 324 B.R. 115, 121 (Bankr. D. Ariz. 2005) ('Indeed, a review of [s]ection 541 provides that the collected funds in the [d]ebtor's account became property of the bankruptcy estate either pursuant to [s]ection 541(a)(1) or (a)(2)[.]'); *In re Taylor,* 332 B.R. 609, 611 (Bankr. W.D. Mo. 2005) ('property of the estate includes the funds in the account'); *In re Dybalski,* 316 B.R. 312, 316 (Bankr. S.D. Ind. 2004) ('the [f]unds are property of the estate')"). Consistent with estate property in bankruptcy law, Revitalization insists that the funds in Castle Walls' bank account constitute estate property under the receivership statute.[6]

Johansen points to a different bankruptcy case that it contends is more analogous to this situation, *In re Chapman*, 265 B.R. 796 (Bankr. N.D. Ill. 2001). In *Chapman*, United States Shippers Inc. (USSI) wrote a check for $40,378.00, payable to Donnelly Transportation Inc., for services Donnelly performed for USSI. *Id.* at 819. The debtor, Chapman, a man who had no business relationship with

---

[6] Johansen states that merely "because money is in an account does not mean it belongs to the account holder." In support of this assertion, it cites to *In re Marriage of Schwarz*, which explained that "'[p]roperty *in the possession* of a married person is presumed to be community property 'until the contrary is shown.'" 192 Wn. App. 180, 189, 368 P.3d 173 (2016) (internal quotation marks omitted) (quoting *State ex rel. Marshall v. Superior Court*, 119 Wash. 631, 637, 206 P. 362 (1922)). *Schwarz* noted that once a party establishes specific property is separate, the property "will retain that character as long as it can be traced or identified." *Id.* at 190.

While Johansen's statement is correct as to the cited cases, it falls short of addressing the circumstances at hand. Here, as Revitalization notes, the funds that Castle Walls deposited into its bank account had been spent by Castle Walls prior to the appointment of the receiver and thus, there were no funds traceable from Johansen's payment to Castle Walls' bank account.

USSI or Donnelly, and whose name did not appear anywhere on the check, endorsed the check and deposited it into his bank account. *Id.* Chapman also came into possession of two checks written by other individuals, the Smiths, who were refinancing their home, and those checks, which totaled approximately $80,000.00, were payable to the IRS and a landscaping company. *Id.* at 820. Chapman added his name to those checks and deposited them into his bank account. *Id.* When Chapman's bank discovered all three checks were forged and unauthorized by each issuer, it restricted access to his account and returned the altered checks. *Id.* The court held that Chapman had no legal or equitable interest in the funds as "[p]roperty obtained by a debtor's fraud is not part of that debtor's estate." *Id.* at 821. Further, the court explained that the automatic stay could not have been violated because Chapman's bank returned the funds before he filed for bankruptcy protection. *Id.*

*Chapman* is distinguishable. Unlike Chapman, who had absolutely no affiliation with USSI, Donnelly, or the Smiths, obtained possession of their checks without authorization, and fraudulently altered the checks to place the funds into his bank account, Castle Walls was under contract with Johansen and Johansen sent the three checks to Castle Walls in response to invoices for work that Castle Walls had performed on the project pursuant to their subcontract. Moreover, unlike *Chapman*, an automatic stay under the receivership was in effect at the time that the funds were removed from Castle Walls' bank account which was then part of the receivership estate. Johansen explained that when it discovered that Castle Walls' supplier had not been paid, "Johansen pointed out to its bank that the

- 14 -

checks were cashed wrongfully because they weren't properly endorsed" and "the funds did go back to Johansen." While it is not disputed that Castle Walls did not obtain the endorsement of its supplier before depositing the checks in its account, Johansen acknowledged that, at the time of the payments, it owed Castle Walls $101,289.08 for work completed on the project.

Johansen avers that, rather than bankruptcy law, this court should look to "the controlling authority on the effect of Castle Walls' cashing the two-party check with only one endorsement," which it contends is provided by *Bank of the West v. Wes-Con Development Co.,* 15 Wn. App. 238, 548 P.2d 563 (1976). There, a general contractor, subcontractor, and supplier were all engaged in a construction project. *Bank of the West*, 15 Wn. App. at 238. The general contractor issued a joint check to the subcontractor and its supplier, the subcontractor paid the supplier, but the supplier refused to endorse the check from the general contractor. *Id*. at 239. The subcontractor then forged the endorsement of the supplier and deposited the check into its bank. *Id.* The subcontractor's bank, Bank of the West, discovered that the check was fraudulently endorsed and returned the funds to the general contractor's bank, Bank of Everett. *Id.* Relying on articles 3 and 4 of the Uniform Commercial Code, the court explained that joint checks must be negotiated by all parties. *Id.* at 240. "Payment on a forged endorsement is a conversion" and "[a] forged endorsement is 'unauthorized' and wholly inoperative unless ratified." *Id.* (quoting former RCW 62A.1-201(43) (1965)).[7] Because the subcontractor deposited a check with a forged endorsement, and thus no

---

[7] The definition of "unauthorized signature" was moved from RCW 62A.1-201(43) to RCW 62A.1-201(41) when the statute was amended by the Laws of 2012, ch. 214, § 109.

negotiation occurred with the supplier as the other payee, the court held that Bank of the West could not charge the general contractor's account and that the Bank of Everett properly recredited the funds to the general contractor. *Id.* at 240-41.

Johansen asserts that *Bank of the West* shows that Castle Walls' bank was required to return the funds to Johansen's bank because AWVC never endorsed the joint checks. While the holding does establish that a joint check must be endorsed by both payees under articles 3 and 4 of the UCC, that alone does not control the outcome of this case. *Bank of the West* did not deal with an automatic stay, which arises in bankruptcies and receiverships, but addressed a forged endorsement on a joint check, which is distinct from the incomplete endorsement here.

Further, while Johansen now attempts to rely on strict compliance with banking regulations as a basis to reverse the turnover orders, this argument by Johansen is undercut by the fact that the record before us contains at least two demand letters from Johansen to Castle Walls insisting that it pay AWVC what it was owed. The May 16, 2022 demand letter expressly notes the banking irregularities as to the checks and could be read as suggesting Johansen was willing to overlook noncompliance with the banking rules it now invokes as to the incomplete endorsement, so long as Castle Walls met its obligations under the subcontract and the lien was released:

> Joint [c]hecks [checks 25850, 26525, 26865] issued to [Castle Walls] **and** AWVC by [Johansen] appear to have been deposited by [Castle Walls'] bank without proper endorsement by AWVC. While this issue may present specific issue for [Castle Walls'] [b]ank and result in potential violation of certain [b]anking [l]aws, it does not change

- 16 -

[Castle Walls'] liability or duty to defend and indemnify the project [o]wner and/or [Johansen] from the AWVC [l]ien [c]laim.

It is noteworthy that, while the May 2022 demand letter establishes that Johansen was well aware of the banking implications of the endorsement issue as of that date at the latest, it took no action as a result of this knowledge until three business days after the court appointed a receiver, roughly two-and-a-half months later.[8] When it entered its ruling on revision of the commissioner's turnover order, the trial court had before it evidence of Johansen's knowledge of the endorsement issue and the chronology of events with regard to the reversal of the deposits. More critically, even if we assume that Castle Walls' bank was required to return the funds and that the checks were invalid without AWVC's endorsement, those facts alone do not answer the question of whether the trial court erred in exercising its broad equitable powers in response to the particular circumstances of this case. *See King County,* 118 Wn. App. at 127 (explaining flexibility of court's equitable powers in receivership actions). Contrary to Johansen's contention, *Bank of the West* does not control the outcome of the trial court's order requiring turnover pursuant to the receivership statute.

Because the receivership statute broadly defines estate property to include "all right, title, and interests, both legal and equitable, . . . with respect to any property of a person with respect to which a receiver is appointed, regardless of the manner by which the property has been or is acquired," RCW 7.60.005(9), the

---

[8] The date the receiver was appointed, July 29, 2022, was a Friday. The deposits were reversed on Wednesday, August 3, 2022.

trial court did not err in concluding that the funds in Castle Walls' bank account at the time the receiver was appointed were property of the estate.[9]

Although the checks were not endorsed by AWVC when Castle Walls deposited them into its account, at the time Johansen made the progress payments to Castle Walls and AWVC, Johansen owed those funds to Castle Walls and AWVC. Further, the funds had been credited to Castle Walls' bank account well before the receiver was appointed, thus implicating the stay pursuant to the receivership statute and the broad equitable powers of the trial court as to remedies. Based on the circumstances here, the evidence provided the trial court with tenable grounds on which to grant the receiver's motion for revision and, thus,

---

[9] The Associated General Contractors of Washington (AGC) and National Utility Contractors Association of Washington (NUCA) filed a joint brief of amicus curiae in support of Johansen. In arguing that Castle Walls was not entitled to the funds that it deposited into its bank account, amici rely on a recent unpublished case from Division Two of this court, *Jennings v. Rasmussen*, No. 55966-8-II, slip op. (Wash. Ct. App. Nov. 29, 2022) (unpublished), https://www.courts.wa.gov/opinions/pdf/D2%2055966-8-II%20Unpublished%20Opinion.pdf, *review denied*, 1 Wn.3d 1013 (2023). This nonbinding case is cited pursuant to GR 14.1(a) only because it is relied upon by amici.

Jennings and Rasmussen were the only members of Green Collar Cannabis LLC. *Jennings,* slip op. at 1. Jennings sued Rasmussen and the trial court appointed a receiver over Green Collar and entered a preliminary injunction that prohibited Rasmussen from selling or transferring Green Collar assets. *Id.* at 5. Days before the court's orders went into effect Rasmussen transferred $600,000.00 out of Green Collar's accounts, and shortly thereafter, the receiver moved for turnover of those funds. *Id.* at 7. When Rasmussen failed to return the funds, the trial court entered judgment against him for "'willful and wrongful conversion.'" *Id.* at 10. Division Two affirmed and held that the receiver had authority to demand turnover of the $600,000.00 as property of the estate, noted that the trial court found "no bona fide dispute" over the funds, and explained that Rasmussen had both a statutory and fiduciary obligation to cooperate. *Id.* at 15.

*Jennings* does not support Johansen's assertion that the absence of an express finding that there was no bona fide dispute as to the property at issue establishes that such a dispute existed. Rather, it exemplifies the inherent authority that the receiver has to demand return of estate property. Further undercutting Johansen's contention on this issue, findings of fact are not required in matters of equity. *MONY Life Ins.,* 135 Wn. App. at 952. Moreover, unlike Rasmussen who converted the Green Collar funds in violation of the operating agreement and his fiduciary duties, and refused to return them when the court ordered him to do so, Castle Walls simply deposited joint checks issued by Johansen for funds that were owed to Castle Walls and AWVC. Because the facts are materially distinguishable and Jennings does not offer any persuasive authority under these circumstances, we disregard amici's argument to the contrary.

the trial court did not abuse its discretion in requiring Johansen to turn over those funds.

Revitalization acknowledges that Johansen has suffered harm due to Castle Walls' insolvency, but further notes that so did all of Castle Walls' other unsecured creditors. Pursuant to RCW 7.60.210(1), all claims of unsecured creditors "arising prior to the receiver's appointment, must be served in accordance with this chapter, and any claim not so filed is barred from participating in any distribution to creditors in any general receivership." The priorities of claims and distribution thereof place general unsecured creditors last, entitling them to pro rata distribution after all other claims are paid. RCW 7.60.230(1)(h). Allowing Johansen to sidestep the distribution scheme and receive full payment for the funds at issue here is contrary to public policy and the clear intent of our legislature as expressed in the plain language of the receivership statute: to fairly distribute estate property to all of Castle Walls' creditors. Johansen has failed to demonstrate that reversal is required.[10]

IV.    Attorney Fees

Finally, Johansen contends the trial court erred in awarding attorney fees to Revitalization and in denying its competing request for a fee award. Both parties seek fees on appeal.

---

[10] Johansen also assigns error to the entry of judgment in favor of Revitalization. Because this assignment of error rests on Johansen's arguments regarding the propriety of the underlying order on revision of the turnover, which are unavailing, the trial court's entry of judgment in favor of Revitalization was proper.

This court "appl[ies] a two-part standard of review to a trial court's award or denial of attorney fees." *Falcon Props., LLC v. Bowfits 1308, LLC*, 16 Wn. App. 2d 1, 11, 478 P.3d 134 (2020). First, "we review de novo whether there is a legal basis for awarding attorney fees by statute, under contract, or in equity." *Id.* Second, "we review a discretionary decision to award or deny attorney fees and the reasonableness of any attorney fees award for an abuse of discretion." *Id.*

Attorney fees may be awarded if "authorized by statute, contract, or recognized ground of equity." *Gray v. Pierce County Hous. Auth.,* 123 Wn. App. 744, 759, 97 P.3d 26 (2004). Here, the subcontract provides, "If any dispute between contractor and subcontractor arises under this subcontract, the prevailing party in any litigation or arbitration shall be entitled to its reasonable attorneys[] fees." (Some capitalization omitted.) This is a proper legal basis for the trial court's fee award. Johansen offers no argument as to how the trial court abused its discretion in awarding fees apart from its position that it should have prevailed in those proceedings. Because neither the turnover order nor entry of judgment were erroneous, Johansen has failed to demonstrate error with regard to the fee award in the trial court.

As to attorney fees on appeal, "[w]e may award attorney fees under RAP 18.1(a) if applicable law grants to a party the right to recover reasonable attorney fees and if the party requests the fees as prescribed by RAP 18.1," which requires the requesting party to devote a section of its opening brief to the issue. *Wachovia SBA Lending, Inc. v. Kraft*, 165 Wn.2d 481, 493, 200 P.3d 683 (2009). Because Revitalization complied with RAP 18.1, prevailed at the trial court and on appeal,

and the terms of the subcontract entitle it to an award of attorney fees, we grant its request for fees on appeal upon compliance with the procedural requirements of the RAP.

Affirmed.

Hazelrigg, ACJ

WE CONCUR:

Chung, J.

Smith, C.J.